UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | CR-09-157-B-W |
| | ) | |
| BRIAN MURPHY | ) | |

**ORDER ON DEFENDANT'S MOTION TO DISMISS INDICTMENT**

Plaintiff contends that emergency hospitalization for a mental illness cannot qualify as "committed to a mental institution" for purposes of 18 U.S.C. § 922(g)(4) without making the word "commitment" unconstitutionally vague and violating the Second Amendment. The Court denies the motion.

**I.  STATEMENT OF FACTS[1]**

On April 22, 2009, Brian Murphy was involuntarily hospitalized after he attempted suicide. *Application for Emergency Involuntary Admission to a Mental Hospital* Ex. A (Docket # 24). Consistent with Maine law, three steps were taken to ensure Mr. Murphy needed hospitalization. 34-B M.R.S.A. § 3863. First, a psychiatric clinician filled-out and signed an application for emergency committal or "blue paper,"[2] describing why she believed Mr. Murphy was mentally ill and posed a likelihood of serious harm. *Id.* at § 3863(1). Second, a physician certified that she examined Mr. Murphy on the date of the certification and agreed that Mr. Murphy was mentally ill and posed a likelihood of serious harm. *Id.* at § 3863(2). Third, a

---

[1] The Defendant prudently frames the statement of facts as reflecting facts that the Government provided in discovery and intends to prove at trial.
[2] "Blue paper" is the short hand parlance for emergency involuntary admission applications in Maine because historically the three part forms were printed on blue paper. *United States v. Smith*, 511 F.3d 77, 79 n.1 (1st Cir. 2007) (citing *United States v. Flanders*, Crim. No. 03-76-B-W, 2004 WL 444027, at *2 n.1 (D. Me. Mar. 4, 2004)).

judicial officer, here the Chief Judge of the Maine District Court, certified that the application complied with Maine law. *Id.* at § 3863(3).[3]

On April 27, 2009 the hospital moved to formally commit Mr. Murphy through 34-B M.R.S.A. § 3864's hearing process. *Mot. and Order for Dismissal* Ex. C (Docket # 24).[4] On April 29, 2009, the State informed Mr. Murphy of the hospital's intentions. *Notice of Hearing, Order to Examine, and Appointment of Counsel* Ex. B (Docket # 24). This notice, entitled Notice of Hearing, Order to Examine and Appointment of Counsel, stated in part:

> If an Order of Involuntary Commitment is ultimately entered in this case, the patient would be considered a "prohibited person" and may not own, possess, or have under that person's control a firearm pursuant to Title 15, Section 393, Subsection 1.

*Id.* On that same day, however, Eric Kuntz, M.D., interim Chief Medical Officer of Acadia Hospital, moved that the pending application be dismissed because "the said patient may be discharged from involuntary hospitalization with safety." *Mot. and Order for Dismissal* Ex. C. The state court granted the motion on April 30, 2009. *Id.* On June 2, 2009, Mr. Murphy was arrested for having a gun at the Bangor Mall and on October 14, 2009, he was indicted under 18 U.S.C. § 922(g)(4) for possession of a gun by someone "who has been committed to a mental institution." *Indictment* (Docket # 1). Mr. Murphy's sole commitment was his emergency hospitalization in April 2009.

On December 16, 2009, Mr. Murphy moved to dismiss the indictment under both the Second and Fifth Amendments. *Def.'s Mot. to Dismiss* (Docket # 24) (*Mot. to Dismiss*). The Government responded on January 5, 2010. *Gov't's Resp. to Def.'s Mot. to Dismiss* (Docket #

---

[3] Maine law requires that a physician or psychologist examine the patient within 24 hours of admission. Either the patient is again certified as suffering from a mental illness and posing a likelihood of serious harm or the patient is immediately discharged. § 3863(7). The record does not contain any information about this second certification.

[4] Section 3863(5)(B)(2) states that the application for commitment "must be filed within 3 days from the date of admission of the patient under this section, except that, if the 3rd day falls on a weekend or holiday, the application must be filed on the next business day." Normally the hospital would have had to file its application on April 25, 2009. However, because April 25, 2009 was a Saturday, the hospital submitted its application on April 27.

31) (*Gov't's Resp*.).  Mr. Murphy replied to the Government on January 19, 2010.  *Def.'s Reply to Gov't's Resp. to Def.'s Mot. to Dismiss* (Docket # 36) (*Def.'s Reply*).

### A.  34-B M.R.S.A. § 3863 and 34-B M.R.S.A. § 3864

As Mr. Murphy's experience demonstrates, Maine law has two separate procedures for hospitalization when there is concern that a patient poses a likelihood of serious harm because of a mental illness.  Section 3863 allows for emergency hospitalization based on the asserted belief by an applicant and a doctor's certification.  This ex parte procedure provides no opportunity for the patient to respond, but the patient can only be held temporarily.  After three days, the hospital must either release the patient or move to continue the period of commitment.  34-B M.R.S.A. § 3863(5)(B)(2).[5]

Section 3864, on the other hand, allows for long-term commitment: the patient can be committed for up to 4 months after the first hearing and a period not to exceed one year after all subsequent hearings.  34-B M.R.S.A. § 3864(7).  However, commitment under § 3864 is allowed only after a formal hearing during which the patient is afforded extensive procedural rights, including access to an attorney; the ability to testify, present witnesses, and cross-examine; and the right to appeal.  *Id*. at § 3864(5).

### B.  18 U.S.C. § 922(g)(4), *Chamberlain*, and *Holt*

Section 922(g)(4) makes it unlawful for anyone "who has been adjudicated as a mental defective or who has been committed to a mental institution" to possess a gun.  The ban is without exception and is effectively permanent.[6]

---

[5] Although the statute allows for three days, the temporary hospitalization need not end on a weekend or a holiday. 34-B M.R.S.A. § 3863(5)(B)(2). In such instances, as happened here, the patient can be held until the next business day. *Id*.

[6] Under 18 U.S.C. § 925(c) a person previously committed to a mental institution can petition the Attorney General for relief from the firearm ban. Since 1992, however, Congress has prohibited the use of appropriated funds for investigating and acting on such petitions. *United States v. Booker*, 570 F. Supp. 2d 161, 164 n.2 (D. Me. 2008).

Congress did not define the phrase "committed to a mental institution," and in *United States v. Chamberlain*, the First Circuit grappled with the phrase's definition in the context of an emergency commitment under Maine law. 159 F.3d 656, 658 (1st Cir. 1998). Like Mr. Murphy, the defendant in *Chamberlain* had been hospitalized pursuant to 34-B M.R.S.A. § 3863. A clinician filed an application for involuntary commitment; a physician certified, after examination, that the defendant posed a danger of serious harm due to mental illness; and a Maine District Court judge endorsed the application and ordered him admitted to Acadia Hospital for no more than five days, the maximum length of time of an emergency detention under § 3863. *Id.* at 657.[7] Within 24-hours of Mr. Chamberlain's admission, a second physician certified that he was mentally ill and posed a likelihood of serious harm. Eleven months later, Mr. Chamberlain was found with a firearm, and he was subsequently indicted for violating 18 U.S.C. § 922(g)(4). Mr. Chamberlain contended that "he had not, as a matter of law been 'committed to a mental institution' within the meaning of § 922(g)(4)." *Id.* at 658.

The First Circuit rejected the defendant's argument "that a person can be deemed 'committed' under Maine law for purposes of the federal firearms ban only after notice and issuance by a state judge of a formal order of commitment following a full hearing at which the person has had the opportunity to be heard." *Id.* at 661.[8] The First Circuit concluded that it did not appear that "Congress intended that only those persons conclusively found to be suffering

---

[7] Section 3863 allows for a three-day emergency detention. Presumably, the defendant, like Mr. Murphy, was ordered hospitalized on a Thursday, effectively pushing his day of release back two additional days.

[8] Mr. Chamberlain also argued that Maine state law distinguished between an "involuntary admission" under the emergency procedures and a "commitment" under longer-term detention. *Id.* at 661. Observing that whether a defendant is "committed" is a question of federal law, *id*. at 658, the First Circuit noted that "the proper interpretation of the phrase 'committed to a mental institution,' should not turn primarily on the label attached by the state legislature to its procedure, but rather on the substance of those procedures." *Id.* at 663. The First Circuit concluded that the "procedures followed in this case, whether denominated as an 'involuntary admission' or a 'commitment' by the Maine Legislature, constituted in all functional respects a 'commitment' for purposes of § 922(g)(4)." *Id.* at 663.

from mental illnesses or difficulties after have been afforded the fullest possible panoply of due process rights be deemed to have been 'committed to a mental institution' for purposes of the firearms ban." *Id.* at 664.

The First Circuit again addressed the Maine commitment statute in *United States v. Holt*. 464 F.3d 101 (1st Cir. 2006). In *Holt*, a licensed clinical social worker applied for the defendant's involuntary admission to a mental institution, and a psychiatrist certified that he had examined the defendant and that the defendant posed a "likelihood of serious harm due to a mental illness." *Id.* at 102. The next day, a Maine District Judge reviewed the application and authorized the county sheriffs to transport the defendant to a medical facility. What happened next is unclear, but within a couple of months, the defendant was no longer in a medical facility and was in possession of a firearm. *Id.* He was indicted for violating 18 U.S.C. § 922(g)(4) and after a jury trial, found guilty. *Id.* at 103.

On appeal, the defendant challenged whether he had ever been committed within the meaning of § 922(g)(4). He contended that a commitment occurs "only after an application for involuntary commitment has been approved by a state judge, the person has been taken to a medical facility, and a follow-up examination has been performed within 24 hours of the involuntary admission." *Id.* at 102-03. In *Holt*, there was no evidence that a follow-up examination had taken place. The First Circuit stated that "[w]e do not think that the existence of a 24-hour examination makes a difference in the outcome, nor did *Chamberlain* suggest it should." *Id.* at 105. The Court explained that in *Chamberlain,* "at the time the judicial order was issued, and before the second examination had occurred, Chamberlain was ordered 'detained in a mental institution for five days' based on a judicial order that this was in accordance with law. This process meets the ordinary definition of 'commitment' embraced in *Chamberlain*." *Id.* The

5

Court concluded that "the term 'committed' in the statute refers to a judicial (or possibly an administrative) order of commitment and does not depend on the ultimate outcome of the commitment." *Id.*

## II.   DISCUSSION

### A.   Vagueness

#### 1.   The Defendant's Vagueness Argument

Mr. Murphy's vagueness argument turns on the meaning of the word "committed." Relying on the Supreme Court cases *Addington v. Texas*, 441 U.S. 418 (1979) and *Vitek v. Jones*, 445 U.S. 480 (1980), Mr. Murphy says that "committed" must refer only to a commitment that followed proceedings that accorded the person a panoply of rights. *Mot. to Dismiss* at 6-7. Mr. Murphy contends that because he was involuntarily admitted to a hospital without any due process rights, what happened to him during the Maine blue papering process cannot be deemed "committed" under federal law. *Id.*

Mr. Murphy acknowledges that *Chamberlain* found the process in Maine was a commitment under § 924(g)(4). *Id.* However, he asserts that the First Circuit was not asked to address the question he has raised here. He notes that the defendant in *Chamberlain* argued that the "procedure set out for an emergency admission pursuant to a "Blue Paper" was not the equivalent to a "commitment" for purposes of § 924(g)(4)" and that the First Circuit "rejected this argument by finding that Congress had not defined the term 'commitment' and that the dictionary meaning of that term renders an 'involuntary admission' under section 3863 to seem no different from a 'commitment.'" *Id.* at 7 (quoting *Chamberlain*, 159 F.3d at 661) (quotations omitted). But he insists the First Circuit was never asked to address whether a "commitment"

without *Addington-Vitek* due process rights was a "commitment" within the meaning of the federal statute, and the appellate court never ruled on this issue.[9]

Having framed the legal backdrop, Mr. Murphy turns to his main argument: since the Supreme Court defined "commitment" in a fashion that would not include the process Mr. Murphy underwent and the First Circuit defined "commitment" in a fashion that would, the inconsistent use of the same term "renders the meaning of 'commitment' constitutionally vague." *Mot. to Dismiss* at 9.

## 2. Unconstitutional Vagueness

A statute is unconstitutionally vague "only if it 'prohibits . . . an act in terms so uncertain that persons of average intelligence would have no choice but to guess at its meaning and modes of application.'" *United States v. Nieves-Castano*, 480 F.3d 597, 603 (1st Cir. 2007) (quoting *United States v. Councilman*, 418 F.3d 67, 84 (1st Cir. 2005)); *see also Welch v. United States*, 750 F.2d 1101, 1112 (1st Cir. 1985) ("All due process requires is that a statutory prohibition be '…set out in terms that the ordinary person exercising ordinary common sense can sufficiently understand and comply with.'") (quoting *Arnett v. Kennedy*, 416 U.S. 134, 159 (1974)).  Here, the statute adequately put Mr. Murphy on notice that "commitment to a mental institution" would include emergency hospitalization under Maine law and the Supreme Court has not provided an inconsistent definition.

### a. Readily Evident Meaning

The First Circuit in *Chamberlain* gave "commitment" its ordinary meaning: it found Maine's emergency admission procedure qualified under § 922 based on the dictionary definition

---

[9] Mr. Murphy puts the matter less delicately. He states that "the First Circuit entirely missed the fact that the Supreme Court had held that there can be no constitutionally valid 'commitment' without the notice, appointment of counsel, and right to cross examination set forth in [*Addington*] and later re-affirmed in [*Vitek*]." *Mot. to Dismiss* at 7-8.

of "commitment." *Chamberlain*, 159 F.3d at 661. In *Holt*, the First Circuit refined *Chamberlain* and concluded that for purposes of §922(g)(4), a person was "committed" upon the issuance of a "judicial (or possibly administrative) order of commitment." *Holt*, 464 F.3d at 105. Because "the evaluation of the constitutionality of the statute is also made in light of judicial constructions of the statute," *Nieves-Castano*, 480 F.3d at 603 (citations omitted), the clear holding in *Chamberlain* and the refinement in *Holt* removes any doubt that hospitalization under § 3863 qualifies as "commitment" under § 922(g)(4). In accordance with clear First Circuit precedent, when the Maine District Judge signed the emergency commitment order, Mr. Murphy was "committed" under § 922(g)(4).

Statutory context is consistent with the First Circuit's construction. Because Congress banned firearm possession by those "adjudicated as mentally defective" separately from its ban on those "committed to a mental institution," Congress evidently intended to "cast a wider net." *Id.* at 664. "Requiring an adversary hearing and a judicial finding of mental illness would conflate two of the categories Congress singled out for the firearms prohibition." *Id*. Furthermore, Congress affirmatively requires minimum procedural protections before the firearm ban is applied to perpetrators of domestic violence. 18 U.S.C. § 922(g)(8). The absence of similar protections with respect to determining who has been "committed to a mental institution" implies none is required. *Chamberlain*, 159 F.3d at 665. Ordinary meaning, First Circuit precedent, and statutory context provided ample notice that emergency hospitalization under Maine law qualified as committed under § 922(g)(8).

### b. Treatment by the Supreme Court

The Supreme Court has not provided an alternative definition for the phrase "committed to a mental institution." The word "committed" is not a term of art for civil commitment

procedures that comport with the due process requirements of *Addington*. In *Addington*, the Supreme Court addressed the minimum constitutional procedures required before "*indefinite* commitment." 441 U.S. at 420 (emphasis added). Rather than holding that all commitments automatically required notice, appointment of counsel, and right to cross examination, the Supreme Court carefully delineated how the term was used: the appellant had been "committed temporarily" in the past and now he contested his "indefinite commitment." *Id*.[10]

After *Addington*, courts have upheld state laws that allow temporary commitment without the *Addington* procedural protections. *Simon v. Cook*, 261 Fed. Appx. 873 (6th Cir. 2008) (stating that "[t]he omission of legal counsel and the right to call witnesses makes sense since the decision to hospitalize is being made in response to an immediate presentment of an individual and is only going to last 72 hours"); *Jensen v. Lane County*, 312 F.3d 1145 (9th Cir. 2002) (rejecting defendant's argument that the lack of a civil commitment hearing before a 5-day involuntary admission violated his due process rights); *Rodriguez v. City of New York*, 72 F.3d 1051 (2d Cir. 1995) (same). Although recognizing that all involuntary civil commitments must comport with the requirements of due process, the Ninth Circuit in *Jenson* distinguished between the procedures required for long-term involuntary commitment and short-term emergency commitment. *Id*. at 1146-48. In essence, the *Jenson* Court recognized that the word "commitment" encompasses both "temporary hospitalization" and "long-term commitment requiring due process proceedings." The qualifier, such as "temporary" or "indefinite," not the word "commitment," determines the scope of constitutionally mandated due process.

### c. State Law Definitions and First Circuit Authority

---

[10] In *Vitek v. Jones*, the Supreme Court addressed the procedural rights to be accorded a state prisoner before being involuntarily transferred for treatment from prison to a state mental hospital. 445 U.S. 480, 482 (1980). There is no suggestion that the transfer was an emergency.

Mr. Murphy seeks to infuse confusion into the definition of "committed" by arguing that Maine state law only "considers the [§ 3864] proceeding that was dismissed against Mr. Murphy to be a 'commitment.'" *Mot. to Dismiss* at 9.[11] The First Circuit has already twice rejected this argument. In *Chamberlain*, the First Circuit clarified that the definition of "commitment" is a question of federal, not state law, and that the definition included the emergency involuntary hospitalization procedure that was followed here. *Chamberlain*, 159 F.3d at 663. In *Holt*, the First Circuit reaffirmed its holding in *Chamberlain* that "the substance of the mental institute admission procedures, rather than the label of the procedures as a 'commitment,' is controlling for the federal statute." *Holt*, 464 F.3d at 105.

Moreover, the First Circuit has rejected the premise of Mr. Murphy's argument—that Maine state law recognizes a difference between an "involuntary admission" and a "commitment." *Chamberlain*, 159 F.3d at 661. In *Chamberlain*, the First Circuit expressly stated: "We find no evidence, however, that the Maine Legislature consciously used the

---

[11] In support of his position, Mr. Murphy writes that "[i]t is because the Supreme Court has supplied the definition as to what a constitutionally permitted 'commitment' must involve, <u>as opposed to the definition proved by the First Circuit in *Chamberlain*</u> that renders the statute impermissibly vague." *Mot. to Dismiss* at 8 (emphasis supplied). Mr. Murphy explains that "[t]he Second Circuit noted that two other circuits had relied on state law procedure that separated emergency admissions from formal commitment proceedings (as does Maine) and had found that a person emergently admitted but not later subject to an adversary hearing did not meet the federal definition of 'commitment.'" *Id.* at 8-9 (citing *United States v. Waters*, 23 F.3d 29, 31 (2d Cir. 1994); *United States v. Giardina*, 861 F.2d 1334, 1335 (5th Cir. 1988); *United States v. Hansel*, 474 F.2d 1120, 1122-23 (8th Cir. 1973)).
 First, it is the First Circuit, not the Second, Fifth or Eighth, to which this Court owes direct allegiance. *Eulitt v. Me. Dep't of Educ.*, 386 F.3d 344, 349 (1st Cir. 2004) (stating that "[u]ntil a court of appeals revokes a binding precedent, a district court within the circuit is hard put to ignore that precedent unless it has unmistakably been cast into disrepute by supervening authority"). Although the Court has the ability to follow clearly intervening Supreme Court authority, the First Circuit issued *Chamberlain* and *Holt* after *Addington* and *Vitek* so Mr. Murphy's argument amounts to the contention that the First Circuit erred, a proposition Mr. Murphy is free to argue, but not a proposition this Court is free to accept.
 Second, the First Circuit viewed its approach as "similar to the analysis in *Waters*." *Chamberlain*, 159 F.3d at 663. The *Chamberlain* Court interpreted *Waters* as not following the label attached by the state legislature: "these procedures whether termed an 'admission' or a 'commitment' [by the legislature] . . . established 'commitment' procedures under New York State law, and Waters was 'committed' pursuant to those procedures." *Id.* at 663 (quoting *Waters*, 23 F.3d at 34) (quotations omitted). So, as analyzed by the First Circuit, *Waters* stands against Mr. Murphy's argument, not for it.
 Finally, in *Chamberlain*, the First Circuit discussed both *Giardina* and *Hansel* and declined to follow them. *Chamberlain*, 159 F.3d at 662 (stating that "we respectfully decline to follow the approach of *Giardina* and *Hansel*").

10

'involuntary admission' language to distinguish between that and a 'commitment.' To the contrary, the legislature has used the terms 'admission' and 'commitment' interchangeably." *Id.*

In sum, there is no authority for the proposition that Maine state law treats an admission differently than a commitment or for the contention that the Maine emergency involuntary commitment procedure under § 3863 is not a commitment under § 922(g)(4).

### d. Vagueness and Mr. Murphy

The record in this case reveals that on April 22, 2009, a psychiatric clinician signed an "Application for Emergency Involuntary Admission to a Mental Hospital." *Application for Emergency Involuntary Admission to a Mental Hospital* Ex. A. The application stated that Mr. Murphy had attempted suicide by overdosing on a bottle of sleep medication and drinking whiskey. *Id.* A licensed medical doctor examined Mr. Murphy and expressed the opinion that he had a mental illness that posed a substantial risk of physical harm to himself. *Id.* She certified that an ambulance was the least restrictive form of transportation that meets the patient's clinical needs. *Id.* The application was taken before a state of Maine District Court Judge, and on April 22, 2009 at 6:50 a.m., the Judge issued the following order:

> Upon review pursuant to 34-B M.R.S.A. § 3863(3), I find this application and certificate to be regular and in accordance with the law, and I hereby authorize Any Ambulance Service to take Brian Murphy into custody and transport him or her to Acadia Mental Hospital.

*Id.* A week later another Judge of the Maine District Court issued the Notice of Hearing, Order to Examine and Appointment of Counsel, requiring Mr. Murphy to undergo a psychological examination on May 5 and scheduling a hearing for May 8, 2009. *Notice of Hearing, Order to Examine, and Appointment of Counsel* Ex. B.

Legal arguments sometimes assume an otherworldly air, and real life experiences get lost in definitional subtleties. Although neither the Defendant's nor Government's memorandum

11

confirms all the underlying details, the Court infers that the State Judge's April 22, 2009 Order was complied with, that Mr. Murphy was taken pursuant to judicial fiat to a psychiatric hospital, was held at the hospital for a period long enough for a psychological evaluation to take place, and was allowed to leave the hospital only after the District Judge granted the motion to dismiss the application for emergency commitment on April 30, 2009. To be ambulanced pursuant to court order to a psychiatric hospital, detained there for psychiatric evaluation, and released only when a judge signed a further order would place the ordinarily reasonable citizen on notice that he or she had been involuntarily committed within the meaning of the law.[12]

### B. Second Amendment

Mr. Murphy addresses "the level of process that is due before a person is labeled as one who, due to mental incapacity, has lost an individual right otherwise conferred by the Constitution." *Mot. to Dismiss* at 10. Mr. Murphy argues that the Second Amendment right to bear arms, recognized in *Heller*, can only be deprived after mental status is determined by adjudication. *District of Columbia v. Heller*, 128 S. Ct. 2783 (2008). In other words, because erratic behavior can stem from either mental illness or misinterpreted abnormal behavior, Mr. Murphy contends that *Addington* procedures are necessary to ensure that § 922(g)(4) is "narrowly tailored to address the harm sought to be avoided." *Def.'s Reply* at 7.[13]

---

[12] Although not considered for purposes of this motion, the Government alleges that Mr. Murphy admitted that he in fact knew he was not allowed to possess a gun. His alleged concession dovetails with the Court's common sense assessment.

[13] Mr. Murphy appears to make a hybrid argument. Although arguing under an intermediate level of review, he asks the Court to find that certain minimal procedural protections are necessary to prevent the non-mentally ill or the non-dangerous mentally ill from being wrongly deprived of their Second Amendment rights. A threshold question, however, is whether the procedural rights afforded by the Fifth Amendment apply to the Second. Constitutional rights do not necessarily yield due process rights and no other court has afforded procedural protections to the Second Amendment. Until the Supreme Court or the First Circuit extends due process rights to the Second Amendment, the Court does not reach the merits of the due process aspects of Mr. Murphy's argument.

Mr. Murphy argues that procedural protections are relevant to whether § 922(g)(4) is narrowly tailored to the goal of preventing possession by the mentally ill who pose a threat of harm. He contends that absent a hearing to determine actual dangerousness, "the Government has not established that Mr. Murphy falls within a class of those who are 'inherently dangerous' due to a mental illness." *Def.'s Reply* at 7. Although *Chamberlain* found that commitment under § 3863 was sufficiently related to dangerousness, Ms. Murphy contends *Chamberlain* is not controlling because it was written before *Heller* and decided under rational review. Mr. Murphy argues that hospitalization under § 3863 is not sufficiently related under the intermediate or strict scrutiny that applies post-*Heller*. The Court disagrees for two reasons.

First, the Court takes *Heller* at its word that "nothing in our opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill." *Heller*, 128 S. Ct. at 2816-17. Based on this language, this Court in *Booker* found it unnecessary to delineate the appropriate level of scrutiny for the prohibition of firearm possession by those convicted of misdemeanor crimes of domestic violence. *Booker*, 570 F. Supp. 2d at 163 (finding the misdemeanor crime of domestic violence sufficiently similar to possession of firearms by felons and the mentally ill "to justify its inclusion in the list of 'longstanding prohibitions' that survive Second Amendment scrutiny"). The Court's conclusion in *Booker* applies with more force given *Heller*'s express reference to the mentally ill.

The First Circuit has also intimated that groups subject to "longstanding prohibitions" against gun possession might not have full Second Amendment rights. *United States v. Rene E.*, 583 F.3d 8 (1st Cir. 2009). In *Rene E.*, the First Circuit concluded that, based on longstanding prohibitions against firearm possession by juveniles, "the right to keep arms in the founding period did not extend to juveniles." *Id.* at 16; *see also United States v. Skoien*, 587 F.3d 803, 809

n.3 (7th Cir. 2009) (describing the holding in *Rene E.* as "[t]he court concluded that the founding-era understanding of the Second Amendment right likely excluded juvenile handgun possession from the scope of the right"). Prohibitions against firearm possession by mental incompetents are as long-standing. *Id*. at 15-16 (describing historical prohibitions against gun possession by juveniles and the mentally ill as similar); *cf. Skoien*, 587 F.3d at 810 (basing conclusion that misdemeanants had not forfeited Second Amendment rights on the lack of argument by the government and the inconsistent historical treatment).

Second, Mr. Murphy's argument relies on a distinction between emergency and adjudicated commitments that the First Circuit specifically found did not exist. Mr. Murphy argues that a three-day emergency commitment cannot justify a life-long ban on gun possession but accepts that adjudicated commitment can.[14] In *Chamberlain*, however, the First Circuit found temporary hospitalization under Maine law "implicates the potential for harm Congress sought to regulate under the firearms ban." *Chamberlain*, 159 F.3d at 665. Because the First Circuit concluded that both forms of involuntary hospitalization under Maine law indicate the same potential for future harm, this Court cannot now decide that they do not.

## III. CONCLUSION

The Court DENIES Mr. Murphy's Motion to Dismiss (Docket # 24).

SO ORDERED.

/s/ John A. Woodcock, Jr.
JOHN A. WOODCOCK, JR.
CHIEF UNITED STATES DISTRICT JUDGE

Dated this 3rd day of February, 2010

---

[14] A more precise description of Mr. Murphy's argument is that the lack of accuracy prevents a reasonable fit. Accuracy, however, is a question of due process—an argument rejected above. Instead, the question of "reasonable fit" asks whether, assuming that emergency hospitalization was necessary, such a temporary commitment justifies a permanent ban on gun possession. In fairness to Mr. Murphy, the Court treats him as having also made this second argument.

14